IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LAURA FRANKLIN and )
MIGUEL GUTIERREZ, )
 )
            Plaintiffs, )
 )
        v. ) CASE NO.  2:13-CV-103-WKW
 ) [WO]
NATIONAL GENERAL )
ASSURANCE COMPANY, )
 )
            Defendant. )

## MEMORANDUM OPINION AND ORDER

Laura Franklin and Miguel Gutierrez, once litigation adversaries, now join

as Plaintiffs in this action against National General Assurance Company

("NGAC"), seeking to recover the damages awarded to Mr. Gutierrez and against

Ms. Franklin in an underlying state-court action.  The underlying state-court action

arose from a rear-end, motor-vehicle collision that rendered Mr. Gutierrez a

paraplegic.  Ms. Franklin was the driver who rear ended Mr. Gutierrez's vehicle.

Mr. Gutierrez commenced the underlying state-court action after NGAC refused

multiple, pre-suit offers to settle Mr. Gutierrez's claim for the $50,000 limits of

Ms. Franklin's automobile insurance policy.  A jury found Ms. Franklin liable for

$13 million in compensatory damages, and, the appeals process having run its

course, Ms. Franklin now is indebted to Mr. Gutierrez on a remitted judgment of $9 million.

The differential between $50,000 pre-suit settlement offers and the $9,000,000 judgment led to this diversity lawsuit.  Ms. Franklin brings third-party negligence, wantonness, and bad-faith claims against NGAC, asserting that it failed to exercise ordinary care and good faith to investigate and settle Mr. Gutierrez's claim for the Policy limits.  Mr. Gutierrez, through an assignment of rights from Ms. Franklin, brings a breach-of-contract claim arising from NGAC's failure to obtain an appeal bond and pay the premium for the appeal bond in the full amount of the state-court judgment.  NGAC moves for partial summary judgment on Ms. Franklin's third-party wantonness and bad-faith claims and on Mr. Gutierrez's breach-of-contract claim.  (Doc. # 128.)  The motion has been fully briefed.[1]  (Docs. # 128, 141, 145.)

After careful consideration of the arguments of counsel, the relevant law, and the evidentiary submissions, the court finds that the motion for partial summary judgment is due to be denied.[2]

---

[1] NGAC does not move for summary judgment on the third-party negligence claim for failure to investigate and settle.

[2] This opinion does not address NGAC's separately filed *Daubert* motion, and the denial of partial summary judgment does not rest on those experts' contested opinions.

## I.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*; Fed. R. Civ. P. 56(c)(1)(A).  Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact

finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND[3]

### A.    The Collision

The catastrophic collision happened on February 15, 2010, as Ms. Franklin and Mr. Gutierrez were traveling alone in separate vehicles in the northbound lane of Highway 231, a four-lane highway with a posted speed limit of fifty-five miles-per-hour.  At approximately 10:30 p.m., Ms. Franklin's Ford Explorer struck Mr. Gutierrez's Toyota Corolla in the rear.  Ms. Franklin and Mr. Gutierrez dispute what occurred during the seconds before impact.  Mr. Gutierrez claims that he had been driving in his lane within the speed limit for about a quarter of a mile, when Ms. Franklin, who was speeding and texting, rear-ended his vehicle.  Ms. Franklin contends that she was driving the posted speed limit, was not texting, and that Mr. Gutierrez suddenly turned right onto Highway 231 from a gas station into the lane directly in front of her, leaving her no time to avoid the collision.

There is no dispute, however, as to the catastrophic nature of the rear-end impact.  Photographs depict that the passenger side rear corner of Mr. Gutierrez's

---

[3] This case arises from a "small mountain of facts."  (Doc. # 145, at 21; *see also* Doc. # 128-1, at 9 n.2.)  As NGAC observes, the many facts that form this small mountain are set out in Plaintiffs' summary judgment response.  Although NGAC "vehemently dispute[s]" many of Plaintiffs' facts (Doc. # 145, at 21), those facts, for the most part, are the summary judgment facts, but not necessarily the "actual facts."  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1281 n.1 (11th Cir. 2006).

vehicle was crushed forward over the rear axle and into the back seat, and the collision caused Mr. Gutierrez to suffer a lower spinal cord injury, rendering him a paraplegic. To this date, Mr. Gutierrez, who is in his late fifties, is wheelchair bound, incontinent of bowel and bladder, and confined to a nursing home.

The Alabama Uniform Traffic Crash Report provides further details about the accident. It states that the collision occurred on a "straight, level" roadway, the weather was "clear," the area was a well-lit "shopping or business" area, and there were no skid marks. The report states further that the collision was a "rear-end," "front-to-rear" collision and that Mr. Gutierrez was transported by "EMS ground" to Baptist South Hospital due to his "incapacitating" injuries. It identifies Mr. Gutierrez as the "primary contributing unit" and concludes that he "fail[ed] to yield [the] right of way." No citations were issued at the scene, however. Additionally, because Mr. Gutierrez was incapacitated, he did not give the investigating officer a statement. Rather, the report contains only Ms. Franklin's statement that, as she "was traveling down the roadway [Mr. Gutierrez], pulled out in front of her and she could not avoid the collision." (Police Report (Def.'s Ex. 2).)

## B.   Pertinent Policy Provisions

At the time of the accident, Ms. Franklin, a twenty-year-old college student, was covered under her parents' NGAC automobile insurance policy ("Policy"). There is no dispute that the premiums were current and that the

5

collision was a covered claim.  There also is no dispute that the Policy provided
$50,000 in liability coverage for bodily injury.  (Policy, at 6 & Declarations Page
(Ex. A to Compl.).)

The following provisions of the Policy are relevant for purposes of this
litigation.  As to NGAC's settlement and defense obligations, the Policy provides
as follows:

> We will settle or defend, as we consider appropriate, any claim or suit
> asking for [bodily injury] damages.  If we defend, we will choose the
> counsel of our choice which may include an in-house counsel.  In
> addition to our limit of liability, we will pay all defense costs we
> incur.  Our duty to settle or defend ends when we offer to pay and pay
> our limit of liability for this coverage.

(Policy, at 3.)  The corresponding obligations of the insured require him or her,
when "seeking coverage," to "cooperate with [NGAC] in the investigation,
settlement or defense of any claim or lawsuit," and to "not voluntarily assume any
obligation to pay [or] make any payment or incur any expense . . . for bodily injury
. . . arising out of an accident."  (Policy, at 18.)  Additionally, the failure of the
insured to comply with his or her obligations "may result in denial of coverage and
relieve [NGAC] of all duties to investigate, settle, defend, pay any judgment or
otherwise honor any claims made against an insured."  (Policy, at 18.)  Because
NGAC chose to defend Ms. Franklin and appeal the adverse judgment, the
Supplementary Payments section of the Policy placed an additional obligation on
NGAC:  "In addition to [its] limit of liability, [NGAC] will pay on behalf of an

insured . . . premiums on appeal bonds . . . in any suit [it] defend[s] and [it] choose[s] to appeal."  (Policy, at 3.)

## C.   Mr. Gutierrez's Policy Claim and NGAC's Investigation

On February 17, 2010, two days after the collision, Ms. Franklin's mother reported the accident to NGAC.  Although she mistakenly referred to it as a "T-bone" collision, she told the NGAC representative that Mr. Gutierrez's vehicle "was just demolished," and he "would be dead if [Ms. Franklin's SUV had] hit his driver['s side]."  The call representative acknowledged "it was a really bad accident" and told her that NGAC would "do a full investigation separate from the police department just to make sure that everything . . . aligns [with the police report]."  (Telephone Call Transcript (Def.'s Ex. 1).)

On the same date, NGAC assigned the claim to Gary Sneed, one of its property-damage adjusters in Georgia.  Mr. Sneed treated the claim as one for property damage and closed the file the same day.  The next day, February 18, 2010, Mr. Sneed received a letter from Keith Bennett, Esq., that he was representing Mr. Gutierrez on a claim for bodily injury.  Based on receipt of that letter, Mr. Sneed opened a bodily injury claim for Mr. Gutierrez but indicated in his February 18 claims note that he would "issue [a] denial [of the claim] if [the] police report confirms facts of loss as presented [by Ms. Franklin]."  (Claims Note, at 12343 (Pl.'s Ex. 140-1).)  During his deposition in this case, Mr. Sneed testified

that "it was [his] responsibility to handle the liability investigation" and that NGAC "entitle[d him] to deny" the claims.  (Sneed's Dep., at 174 (Pl.'s Ex. Doc. # 140-24).)  This was Mr. Sneed's first bodily injury claim.  (Sneed's Dep., at 20, 28.)

On February 19, 2010, the Franklins faxed a copy of the police report to Mr. Sneed.  Mr. Sneed recognized after reviewing the police report that Mr. Gutierrez did not get "T-boned" and "got out far enough to straighten before being hit." (Claims Note, at 12342.)   On February 22, 2010, Mr. Sneed also received and reviewed an appraisal estimate with photographs of Mr. Gutierrez's vehicle, performed by NGAC's field appraiser at Mr. Sneed's request.  The same date, Mr. Sneed wrote Mr. Bennett, informing him that he was "in the process of investigating th[e] accident" and needed "complete medical reports, bills, wage verification, and a settlement demand . . . ."  (Sneed's Feb. 22 Letter (Ex. C to Compl.).)

The next day, however, in a letter dated February 23, 2010, Mr. Sneed informed Mr. Bennett that he had "completed an investigation of the accident details involving [his] client."  Mr. Sneed explained that his investigation revealed that Ms. Franklin "was not legally liable for [Mr. Gutierrez's] loss," and that, as a result, he was denying payment on Mr. Gutierrez's claim.  (Sneed's Feb. 23 Letter (Ex. D to Compl.).)   Mr. Sneed conditioned his denial of Mr. Gutierrez's bodily

injury claim, stating that, "if [Mr. Bennett] f[ound] any additional evidence, [he would] reconsider [NGAC's] position." (Sneed's Feb. 23 Letter (Ex. D to Compl.).) Hence, Mr. Sneed denied the claim after reviewing Ms. Franklin's statement, the police report that placed Mr. Gutierrez at fault, the appraisal estimate of Mr. Gutierrez's car, and the photographs of his car. (Sneed's Dep., at 131–36.) Mr. Sneed believed this information was sufficient to show, at the very least, contributory negligence on the part of Mr. Gutierrez and that, therefore, under Alabama law, Mr. Gutierrez would not be able to recover from Ms. Franklin. (Sneed's Dep., at 176); *see, e.g., Norfolk S. Ry. Co. v. Johnson*, 75 So. 3d 624, 639 (Ala. 2011) ("Contributory negligence is an affirmative and complete defense to a claim based on negligence."). At his deposition, Mr. Sneed confirmed that he denied the claim based solely on a liability assessment (*i.e.*, on Mr. Gutierrez's contributory negligence). (Sneed's Dep., at 184, 197; Claims Note, at 12340.)

Unaware that Mr. Sneed already had denied the claim, Mr. Bennett called Mr. Sneed on February 23, 2010, to discuss Mr. Sneed's February 22 request for information. Mr. Sneed orally informed Mr. Bennett that he had denied the claim and that the letter documenting the denial was "on the way." (Bennett's Dep., at 128 (Pl.'s Ex. 140-25).) Notwithstanding the denial, Mr. Bennett informed Mr. Sneed that Mr. Gutierrez's version of how the collision occurred did not align with Ms. Franklin's. Mr. Bennett relayed to Mr. Sneed that, according to Mr. Gutierrez,

he did not pull out in front of Ms. Franklin.  Mr. Bennett also told Mr. Sneed that he had photographed the scene, that there were no skid marks at the scene, and that Mr. Gutierrez was paralyzed from the waist down.  (Bennett's Dep., at 59–60, 82.) Although some of the contents of this call are in dispute,[4] Mr. Sneed's February 25, 2010 claims note confirms that Mr. Bennett told him Mr. Gutierrez had a "lower spine injury."  (Claims Note, at 12340.)  Mr. Sneed testified he knew this could mean "paraplegia," but he did not request additional information about Mr. Gutierrez's injury.  (Sneed's Dep., at 212–13.)  Mr. Bennett also asked about the liability limits under the Policy, but Mr. Sneed declined to tell him.  (Bennett's Dep., at 136.)  On March 4, 2010, Mr. Sneed acknowledged in the claim notes that Ms. Franklin may "file suit" based on NGAC's denial of Mr. Gutierrez's claim. (Claims Note, at 12340.)

On March 9, 2010, two weeks after NGAC had denied the claim, NGAC Claims Manager Tabatha Schultz reviewed the file and wrote in the claim notes that "1% [contributory negligence] bars recovery" and that it "appears we have at least that against [Mr. Gutierrez], if not all."  Ms. Schultz also documented that she

---

[4] NGAC contends that it was not informed of Mr. Gutierrez's paralysis until May 14, 2010, during a conversation between Mr. Bennett and Joe Lord, an NGAC adjuster.  (Def.'s Reply Br., at 21 (Doc. # 145).)  For purposes of summary judgment, Mr. Bennett's account of the information he relayed to Mr. Sneed on February 23, 2010, is accepted as true.  Accordingly, for purposes of summary judgment, NGAC knew that Mr. Guiterrez was paralyzed from the waist down on February 23.

was taking the file "[o]ff mngr. [manager] diary" and requested Mr. Sneed to "notify [her] if [Mr. Gutierrez] pursued [it] further."  (Claims Note, at 12340.)

On April 7, 2010, Mr. Bennett wrote Mr. Sneed, requesting that he reconsider the denial of Mr. Gutierrez's claim.  Mr. Bennett advocated that Ms. Franklin's fault was "clear" because she struck Mr. Gutierrez "from behind."  He also noted that Mr. Gutierrez "ha[d] very severe injuries, ha[d] undergone two surgeries, and ha[d] incurred high medical bills for weeks of hospitalization[,] . . . [was] uninsured and [was] personally responsible for the medical bills."  Mr. Bennett attached a $57,632.02 medical bill that contained diagnosis codes for spinal cord injury, fracture of two ribs, contusion of the lung, dislocation of two cervical vertebrae, traumatic pneumothorax, and injury to the head.  He asked Mr. Sneed to review his investigative materials again and inform him whether NGAC "intends to pay the claim."[5]  (Bennett's Apr. 7, 2010 Letter (Ex. E to Compl.); Medical Bill (Pl.'s Ex. 140-12); Def.'s Ex. 3.)   The letter also included an offer of settlement for policy limits:

> In closing, I want to let you know that my client is in a desperate situation and needs money. Consequently, he will accept your insured's policy limits (along with evidence of what those limits are) as full and final settlement of his claim.  My client is willing to accept those limits and will give your insured a full and final release of any and all possible liability.  Hopefully, we can get this matter worked out quickly as my client is in great need.

---

[5] As NGAC points out, this medical bill is the only medical record or bill that NGAC received prior to Mr. Gutierrez's filing suit.

(Bennett's Apr. 7, 2010 Letter, at 1.)

Upon receiving this Policy limits demand letter, NGAC reassigned the claim to Joe Lord, a senior claims representative and "high-exposure" claims handler who specialized in large loss or high-risk claims. (Claims Note, at 12339; Lord's Dep., at 11–12 (Pl.'s Ex. 140-28).) Like Mr. Sneed, Mr. Lord was not in Alabama; he worked in Texas. (Lord's Dep., at 318.) When Mr. Lord reviewed the file on April 19, 2010, he knew that Ms. Franklin's "exposure was going to be much greater than the amount of coverage she had" because he knew (1) that Mr. Gutierrez had suffered a severe rear-end impact, (2) that he was contesting liability, (3) that he had a "spinal injury," (4) that his first hospital bill, which covered only six days, was $58,000, and (5) that he was uninsured and had additional bills forthcoming for several additional weeks of hospitalization and two surgeries. (Claims Note, at 12338–39; Lord's Dep., at 100–02, 106–07, 109, 111, 153–55.)

On the same day of his file review (April 19), Mr. Lord wrote a letter to Mr. Bennett seeking to discuss his client's "liability theory," and reiterating that NGAC had denied the claim "based upon [its] previous liability investigation." (Lord's Apr. 19, 2010 Letter (Ex. F to Compl.).) Consequently, on April 21, 2010, Mr. Bennett wrote Mr. Lord expressing disbelief that NGAC had denied Mr. Gutierrez's claim, given that Ms. Franklin's vehicle had rear ended Mr. Gutierrez's

and the seriousness of Mr. Gutierrez's injuries.   Mr. Bennett made a second

settlement demand for the Policy limits with a thirty-day deadline:

> [Mr. Gutierrez] demands [Ms. Franklin's] policy limits and will not
> accept one penny less than full payment of those limits.   In exchange
> for payment of those limits, [Mr. Gutierrez] will give your insured a
> full and final release of all possible claims.   If you refuse to tender
> your policy limits in the next thirty days, then [Mr. Gutierrez] will be
> forced to move forward with filing this lawsuit against your insured
> and will not be in a position to accept your insured's limits after the
> case has been filed.

(Bennett's Apr. 21, 2010 Letter (Ex. G to Compl.).)   NGAC never responded to the

time-limited settlement demand.

Mr. Lord completed a large loss report ("LLR") on May 5, 2010.   (Claims

Note, at 12339;  LLR (Pl.'s Ex. 140-6).)   NGAC requires an LLR when a claim has

"an exposure at or above $50,000."   (NGAC Claim Handling Guidelines, at 476

(Pl.'s Ex. 140-7).)   Mr. Lord recommended rejecting Mr. Gutierrez's second

settlement demand based on contributory negligence:

> Upon my review of the liability of this case, I do not find that our
> insured is 100% responsible for this accident as the claimant attorney
> indicates.   The police report documents that the primary contributing
> factor was that the claimant failed to yield right of wa[y] from a
> private drive. . . .   Alabama has the 1% negligence rule.   This means
> if either party is determined to have contributed at least 1% of the
> negligence to the loss, then they are [sic] barred from recovery from a
> liability perspective.   I recommend that we maintain our liability
> stance at this time[;] we will more than likely draw suit here on this
> case, which we can forward to our defense counsel for continued
> handling.

(LLR, at 10514 (Pl.'s Ex. 140-6).)   Upon reviewing the LLR, Nancy Gregg, NGAC's regional claims manager, concluded NGAC "didn't have an exposure based on Alabama negligence laws." (Gregg's Dep., at 123 (Pl.'s Ex. 140-27).)

On May 14, 2010, Mr. Bennett again told Mr. Lord that Mr. Gutierrez had been on Highway 231 "for a quarter of a mile" when Ms. Franklin's vehicle struck his from behind, that he did not pull out from the gas station as claimed by Ms. Franklin, and that Mr. Gutierrez was "paralyzed from the waist down." (Claims Note, at 12337; Sneed's Dep., at 210–12.)   Mr. Lord's note about the call acknowledged that Mr. Bennett told him that he had sent all of the medical records and bills that he had. (Claims Note, at 12337.)   Before ending the call, Mr. Lord asked Mr. Bennett for his cell phone number so that he could contact him the following week after speaking with his supervisor about settling the claim. (Bennett's Dep., at 228.)   However, Mr. Lord did not contact Mr. Bennett the following week.  Rather, Mr. Lord made an internal recommendation that NGAC "maintain [its] liability stance." (Lord's Dep., at 114; *see also* Claims Note, at 12337.)

During the time that Mr. Lord was assigned Mr. Gutierrez's claim, he was focused on the liability assessment and whether there were facts "that could cause a change in the liability interpretations of the claim." (Lord's Dep., at 60; *see generally* LLR.)   Mr. Lord admitted that he "ha[d] an independent duty and

14

obligation to [his] insured to thoroughly and objectively investigate the claim." However, other than the information Mr. Bennett provided during the May 14 telephone call, Mr. Lord merely reviewed the file and did not independently gather any new information.  (Lord's Dep., at 59–60.)

Mr. Gutierrez's settlement demand expired on May 21, 2010, without a response from NGAC.  In a letter dated May 25, 2010, Mr. Lord wrote Mr. Bennett, seeking "a medical narrative from [Mr. Gutierrez's] treating physician that would outline his current medical condition from the injury he sustained in this accident."  (Lord's May 25, 2010 Letter (Ex. H to Compl.).)  According to the letter, Mr. Bennett previously had indicated that the medical narrative would be forthcoming.

Mr. Bennett responded in a letter dated May 27, 2010.  He denied that he had agreed to provide a "medical narrative."  He explained that he did not have copies of his client's medical records because "[m]edical records are very expensive to order and would only draw down from whatever small amount of proceeds are likely available from [the] existing insurance policy."  The letter also "ma[d]e one last demand for [NGAC's] policy limits . . . in exchange [for] a full and final release of all claims against [Ms. Franklin]," and required receipt of the proceeds within seven days.  Concluding, Mr. Bennett explained that, "[i]f [NGAC] refuse[d] to tender [the $50,000] policy limits within the next seven days,

then [Mr. Gutierrez] w[ould] be forced to move forward with filing this lawsuit against [Ms. Franklin]" and that Mr. Gutierrez would not accept NGAC's Policy limits if litigation commenced.   (Bennett's May 25, 2010 Letter (Ex. H to Compl.).)

On June 2, 2010, Mr. Lord updated the LLR as follows:

> We have previously denied liability twice on this case . . . client was paralyzed from the waist down . . . will never walk again . . . claimant proceeded approximately ¼ mile . . . was hit from behind . . . no witnesses . . . it is a he said she said . . . meds around $500k . . . I have no documentation from the attorney to support the allegations of paralysis on this client . . . I still feel culpability on the part of the claimant of at least 1% which is grounds for our original liability denial in Alabama . . .  I have spoken with [Ms. Franklin] and informed her there may be a lawsuit forthcoming on the file.  Based on the lack of liability and medical evidence . . . not provided by the claimant attorney as requested to him, I suggest at this time we maintain our denial as to our previous liability position in writing to the claimant attorney and defend the suit if filed as necessary.

(LLR, at 10515.)   The June 2 update to the LLR also includes Mr. Bennett's statement that, in past cases, "he has not had any problem in explaining the [1% rule] to AL jurys . . . and can usually get around this issue."  (LLR, at 10515.)

On June 3, 2010, the day the settlement offer expired, Mr. Lord again wrote Mr. Bennett and asked for "[a] medical narrative from [Mr. Gutierrez's] treating physician outlining the current medical condition" and "[a]ny evidence that [he] may have that is to the contrary that would cause [NGAC] to reconsider [its] position regarding the liability facts surrounding this matter."  (Lord's June 3, 2010

Letter (Ex. J to Compl.).)   Mr. Bennett opted instead at this point to commence suit.

**D.     NGAC's Post-Suit Conduct In the Underlying Action**

On June 7, 2010, Mr. Gutierrez filed suit in the Circuit Court of Montgomery, Alabama.   (Def.'s Ex. 4 (Doc. # 128-2, at 103–11).)   NGAC provided a defense to Ms. Franklin in accordance with the Policy's provisions.

On September 15, 2010, more than three months into the litigation, NGAC reassigned the claim to Cennelle Johnson.[6]   (Claims Note, at 12333.)   On September 20, 2010, Ms. Johnson emailed her supervisor, Phil Palmer, and indicated that she "spoke with [the defense attorney] in detail about this particular file" and had requested an evaluation report with an economic analysis associated with "defend[ing the case] on liability."   She noted that she would send him an "update[d] analysis pertaining to same with forecasted expenses to proceed to trial versus settlement tomorrow."   (Johnson & Palmer's Emails (Pl.'s Ex. 140-14).)

---

[6] Mr. Lord's last claims note was on July 29, 2010.   He resigned from NGAC in August 2010.   (Lord's Dep., at 279–80, 340.)   As Plaintiffs point out, Mr. Lord's performance rating from NGAC for 2008 stated he "inconsistently perform[ed], and, in January 2010, NGAC gave him a written warning because his 2009 rating stated that he "d[id] not meet" expectations. (Lord's Dep., at 249–52, 258.)   Also in January 2010, NGAC issued Mr. Lord a written warning because his 2009 rating stated that he "d[id] not meet" expectations.   (Lord's Dep., at 249–52.) He was on a probation status with NGAC at the time he resigned.   (Lord's Dep., at 279–80, 340.)

The defense attorney's evaluation report informed NGAC that the exposure to Ms. Franklin was "$5M +" (*i.e.*, $5 million or more).[7]  In that report, the defense attorney reported that Ms. Franklin's chance of prevailing at trial was "80-100%," but that a cost-benefit analysis favored a settlement for Policy limits:

> I believe the case will cost approximately $20,000 to prepare and try, based on what we know at the present.  With limits, of $50,000, NGAC will have to decide whether it is worth a potential savings of $30,000 with a victory, to chance a very large excess judgment.  The undisputed medical bills will likely exceed $300,000, and Alabama law requires that a plaintiff who wins at trial to receive at least his undisputed medical bills. . . .  [I]t seems to me that the best economic decision is to settle within limits if possible to avoid a potentially large excess judgment.

(Attorney Suit Evaluation Report, at 1266–67 (Pl.'s Ex. 140-11); *see also* LLR, at 10516–18.)

Based upon the evaluation report, Mr. Palmer told Ms. Johnson that he was "okay with giving [the defense attorney] the $50K in . . . limits and having him negotiate his best result for us."  In response, Ms. Johnson gave the defense attorney "authority up to $50K to resolve the claim."  (Johnson & Palmer's Emails (Pl.'s Exs. 140-14, 140-15, at 1504).)

On October 5, 2010, NGAC offered to settle the lawsuit for the $50,000 Policy limits.  Mr. Gutierrez rejected the offer on October 8, 2010.  Shortly thereafter, NGAC put its reinsurer on notice of Ms. Franklin's potential tort claims

---

[7] The LLR indicates that NGAC received the defense attorney's evaluation report on or before September 24, 2010.  (LLR, at 10516.)

against it.  (Johnson's Dep., at 280–81 (Def.'s Ex. 140-30).)   In a pleading filed October 18, 2010, NGAC filed a $50,000 offer of judgment, which by operation of law was "deemed withdrawn" after ten days.  Ala. R. Civ. P. 68.

**E.      Jury Verdict and Appeal in the Underlying State-Court Action**

The case proceeded to trial on Mr. Gutierrez's negligence claim.  Mr. Gutierrez's theory was that Ms. Franklin was texting while driving eighty miles-per-hour.  As a result, notwithstanding clear visibility of Mr. Gutierrez's vehicle for at least six seconds, Ms. Franklin rear ended Mr. Gutierrez's vehicle that was traveling thirty miles-per-hour.  On the other hand, Ms. Franklin denied that she was texting at the time of the accident and argued that Mr. Gutierrez had slowed down to a virtual halt, leaving her no time to avoid the collision.   Multiple competing expert witnesses testified for each side.

On March 16, 2012, the jury returned a verdict in favor of Mr. Gutierrez for $13 million in compensatory damages.  Post-trial, the circuit court remitted the verdict to $9 million.

**F.      Appeal of the Judgment**

Ms. Franklin appealed the judgment, and NGAC retained legal counsel to represent her on appeal.  (*See* Stewart's Dep., at 18 (Pl.'s Ex. 140-33).)  Because Ms. Franklin was a college student with minimal assets and her Policy provided $50,000 in liability coverage, Ms. Franklin's appellate counsel requested the

Supreme Court of Alabama's permission to accept a reduced *supersedeas* bond in the amount of the $50,000 Policy limits, rather than a bond in the amount of 125% of the judgment, which ordinarily is required by statute. *See* Ala. R. App. P. 8(a)(1). The Alabama Supreme Court granted the motion, and the case proceeded before the appellate court. Ultimately, the Supreme Court of Alabama affirmed the judgment without opinion.

## G.   Claims in This Lawsuit

This lawsuit proceeds on three counts, incorporating four theories of liability. Ms. Franklin brings two counts against NGAC for negligent, wanton, and bad-faith failure to investigate and settle. (Counts I and II). The crux of Counts I and II is that NGAC had multiple opportunities prior to the state-court suit to settle Mr. Gutierrez's claim for the $50,000 Policy limits, but failed to do so, and that NGAC acted negligently, wantonly, and in bad faith in refusing to settle without adequate investigation and in basing its decision solely on its belief that Mr. Gutierrez was at least one percent contributorily negligent. Additionally, Mr. Gutierrez, through an assignment of rights from Ms. Franklin, brings a claim for breach of contract for NGAC's failure to obtain an appeal bond and pay the premium for the appeal bond in the amount of 125 percent of the $9 million

judgment (Count III).[8]  (*See*, *e.g.*, Compl. ¶ 66 (alleging that the Policy "gives no indication of the distinction between paying the premium on an appeal bond attainable by the insured versus [NGAC] applying for the bond itself" and that the Policy "plainly indicates that [NGAC] will obtain the bond").)

## IV. DISCUSSION

NGAC moves for summary judgment on three claims:  (1) Ms. Franklin's claim for third-party wanton failure to investigate and settle (Count I); (2) Ms. Franklin's claim for third-party bad faith failure to investigate and settle (Count II); and (3) Mr. Gutierrez's claim for breach of contract (Count III).[9]  Plaintiffs oppose the motion on legal and factual grounds.  Summary judgment is due to be denied on all claims, but only the third-party bad-faith claim in Count II merits extended discussion.[10] [11]

---

[8] Count IV, which a prior Order dismissed as moot, sought a declaration that NGAC had a contractual obligation under the Policy's supplementary payments provision to post an appeal bond in an amount equal to 125 percent of the judgment, as dictated by Rule 8(a)(1), and further sought the court "to compel [NGAC], via the doctrine of specific performance, to . . . post a bond in the amount of 125% of the judgment . . . ."  (Compl. ¶ 63.)

[9] To reiterate, NGAC does not move for summary judgment on Ms. Franklin's claim for third-party negligent failure to investigate and settle, which is included in Count I alongside the claim for third-party wanton failure to investigate and settle.

[10] The court has considered all of the arguments raised by the parties with respect to the third-party bad-faith claim.  Arguments not expressly addressed in this opinion are deemed immaterial to resolving the summary judgment motion.

[11] The motion for summary judgment on the claims for third-party wanton failure to investigate and settle and for breach of contract (Counts I and III) is denied because the court finds that the summary judgment motion raises state law issues, at least one of which is novel, which would be better addressed after a trial on the merits.

The claim for third-party bad faith arose after Mr. Gutierrez obtained a state-court judgment in excess of Ms. Franklin's limits of liability under the Policy issued by NGAC. The summary judgment submissions raise two overarching issues, one legal and one factual. The first issue focuses on the proper standard under Alabama law for analyzing a third-party bad-faith claim. The second issue focuses on the application of the proper standard to resolve whether there is a genuine dispute of material fact as to whether NGAC acted in bad faith in rejecting Mr. Gutierrez's offers to settle his claim for the $50,000 Policy limits.

## A.    Standard of Review

NGAC contends that, to prevail on her third-party bad-faith claim, Ms. Franklin must show the absence of an arguable or debatable reason for its pre-suit refusal to settle Mr. Gutierrez's claim for the policy limits ("arguable reason" test). According to NGAC, a "genuine liability dispute" existed based upon Ms. Franklin's persistent denial of fault and the police report that placed the fault on Mr. Gutierrez. NGAC further contends that the existence of a genuine liability dispute provides an arguable reason sufficient to refuse a policy-limits demand, regardless of the amount of money at stake. Underpinning NGAC's contention of the importance of a genuine liability dispute is Alabama's law precluding a negligence action where the plaintiff was contributorily negligent. Ms. Franklin contends, on the other hand, that the arguable-reason test plays only a limited role

under Alabama law in a *third-party* bad-faith insurance case, and that the arguable-reason test is an element of the plaintiff's claim only in first-party insurance cases. Further, Ms. Franklin argues that the proper test for evaluating a third-party bad-faith claim is multi-factored.

Both sides advance well-reasoned arguments grounded on their interpretation of Alabama law. The briefing is excellent from all counsel and reveals that the issue is not as simple as it would first seem. Ultimately, after going back to the genesis of the third-party bad-faith claim, the court finds that under Alabama law, a totality-of-circumstances approach governs as to claims alleging an insurer's alleged bad-faith failure to investigate and settle a third-party claim, and that the arguable-reason test is not an element of the claim, but rather one of many factors to be considered. To understand how this conclusion was reached, discussion of the history of both first- and third-party claims in Alabama is helpful, and necessary.

In a first-party claim, an insured sues the insurer for failure to pay a direct claim covered under a policy. Whereas, in a third-party claim, the insured, after exposure to a judgment in excess of policy limits, sues the insurer for its failure to

settle the third-party claim within policy limits.[12]  First-party and third-party bad-faith claims have separate geneses under Alabama law.

1.     *The Genesis of the Third-Party Bad-Faith Claim*

The third-party bad-faith claim was the first born, arriving in the summer of 1953.  In *Waters v. American Casualty Co. of Reading, Pa.*, 73 So. 2d 524 (Ala. 1953), the divisive inquiry was whether an insurer's liability for a judgment exceeding policy limits after the insurer refused an opportunity to settle within the policy limits derives from negligence or the doctrine of bad faith.  The Alabama Supreme Court held that an insured may predicate liability on negligence or bad faith or on both.  The court explained that, in the third-party bad-faith context, "when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability," but the insurer refuses and that refusal "is the proximate result of bad faith," the insurer is "liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy."  *Id.* at 531–32.  "[I]t is a question for the jury from *all the facts and circumstances* to determine whether the failure on the part of the insurer to make a settlement is an act of negligence or one of bad faith."  *Id.* at 529 (emphasis added).  The court did not deem it necessary to opine further upon the application

_____

[12] "First-party insurance is insurance purchased for the financial protection of the insured. It covers the insured's health, life, automobile, or home.  Liability insurance is termed third-party insurance, as the insured's liability to others is involved."  45 Am. Jur. Trials § 475.

of "negligence" or "bad faith," given that the terms had "well understood meaning[s]." *Id.* It observed, though, that bad faith "is tantamount to an intentional failure to perform [required] duties," and that "the mere failure on the part of the insurer to make a settlement within the limits of his contract when he has an opportunity to do so is not alone evidence of negligence or bad faith." *Id.* at 529.

On rehearing, however, the *Waters* court accepted the invitation to elaborate upon "the application of the rules of negligence and bad faith" in third-party cases. *Id.* at 531. The court explained:

> A failure to exercise ordinary diligence proximately causing damage to the insured is actionable in tort. The contract of insurance gives the insurer the exclusive right to make a settlement of the claim against [the] insured. That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power, when in the exercise of it. So that, when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so. If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so, and a verdict and judgment are rendered against insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.
>
> If the insurer has already made the investigation and ascertained the facts, to which we have referred supra, and refuses to make such proffered settlement, if such refusal is due to the honest judgment of insurer that the facts do not warrant such a settlement, and the insurer

25

was not negligent in the manner of defending the suit, he would not be liable to [the] insured for an amount in excess of the limit of liability provided in the policy, although the verdict and judgment were in excess of it.  But if such refusal to settle under those circumstances is the proximate result of bad faith on the part of the insurer, he would be liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy.

*Id.* at 531–32.

To summarize, the *Waters* decision imposes upon an insurance company a duty to use ordinary care in the exercise of its exclusive right to settle a third-party claim against its insured and emphasizes a totality-of-circumstances approach.  Specifically, *Waters* held that whether the insurance company acted negligently *or in bad faith* in the exercise of its settlement authority depends upon "*all the facts and circumstances*."  *Id.* at 529 (emphasis added).  While negligence and bad faith are separate torts, the *Waters* decision reveals that the same facts and circumstances are relevant for determining the degree of the insurer's culpability, namely, whether the insurer has acted negligently or in bad faith.  *See also Allen's Alabama Liability Insurance Handbook*, § 13.09, at 286 (2d ed. 2008) (noting the similarity of proof required in negligence and bad-faith claims in the third-party context).

Although *Waters* did not provide a specific list of facts and circumstances for consideration, the opinion highlights the following:  (1) the insurer has a duty to use ordinary care to ascertain facts that are necessary for an enlightened decision

26

about whether a settlement of a third-party's claim within policy limits is warranted[13]; (2) the insurer's refusal to settle based upon an honest judgment that the facts do not warrant a settlement does not rise to the level of negligence or bad faith; (3) bad faith results when the insurer intentionally fails to perform its duties; and (4) the insured's mere failure to settle within the policy limits, when presented the opportunity, is insufficient by itself to amount to negligence or bad faith.

Twelve years after *Waters*, the third-party bad-faith claim again was the subject of discussion in *Hartford Accident & Indemnity Co. v. Cosby*, 173 So. 2d 585 (Ala. 1965).[14]  In *Cosby*, which was an excess-judgment suit brought by the insured against the insurer, the insurer assumed control of the defense in a third-party suit brought against its insured and refused to settle within the $25,000 policy limits, after which the third party obtained a $75,000 judgment against the insured. The Supreme Court of Alabama cited a Fifth Circuit decision as persuasive authority on what proof is required to prevail on a third-party bad-faith claim:

> [T]he insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in

---

[13] Or it could be stated this way:  "An insurer, in order to reach an informed decision as to whether to accept a settlement offer or not, must make a full investigation of the underlying case."  *Allen's Alabama Liability Insurance Handbook*, § 13.11 (2d ed. 2008) (citing, among other decisions, *Waters*, 73 So. 2d at 524).

[14] Five years after *Waters*, the Alabama Supreme Court confirmed the viability of the third-party bad-faith claim:  "There is no doubt that the insurer may be liable beyond policy limits for bad faith in failing to settle claims against the insured within policy limits where thereafter judgment greater than the policy limits is obtained against the insured."  *Dalrymple v. Ala. State Farm Bureau Mut. Ins., Co.*, 103 So. 2d 711, 712 (Ala. 1958).  But that opinion does not elucidate further upon the standard or factors for evaluating the claim.

good faith and dealt fairly with the insured.  The insurer, as it had a right to do under the policy, assumed exclusive control of the claim against the insured, and took unto itself the power to determine for the insured all questions of liability, settlement, of defense and management before and during trial, and of appeal after final judgment.  We are of opinion that this relationship imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured.  It was open to the jury to find that the insurer did not perform this duty.

*Id.* at 604–05 (citing *Am. Mut. Liability Ins. Co. of Boston v. Cooper*, 61 F.2d 446, 448 (5th Cir. 1932)).  *Cosby* reaffirms the totality-of-circumstances approach and highlights that the insurer must "deal[ ] fairly" with its insured and "act honestly and in good faith" in refusing an offer to settle a third-party claim against its insured. *Id.*

Almost twenty-five years after *Cosby*, in 1989, the Alabama Supreme Court decided *State Farm Mutual Automobile Insurance Co. v. Hollis*, 554 So. 2d 387 (Ala. 1989).  *Hollis* involved a third-party *negligent* failure-to-settle claim, not a third-party bad-faith claim, but it is instructive because the same factors govern whether an insurer negligently failed to settle a third-party claim or acted in bad faith.  The *Hollis* court reaffirmed the *Waters* decision as establishing the criteria for the third-party insurance claim and rejected the argument that the insurer's "sincere belief that [its insured] had not been negligent" could defeat third-party negligence.  *Id.* at 390.  "[T]he good faith standard requires more than proof of sincerity." *Id.*  "The insurer has a fiduciary duty to look after the insured's interest

28

at least to the same extent as its own, and to make a knowledgeable, honest, and intelligent evaluation of the claim commensurate with its ability to do so. If the carrier fails to do this then it is liable to the insured for all damages occasioned thereby." *Id.* at 391–92 (citation and internal quotation marks omitted). Citing out-of-state authority as persuasive, the *Hollis* opinion also reiterated a totality-of-circumstances approach:

> While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation [of settlement of a third-party claim] requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

*Id.* at 391 (citation and internal quotation marks omitted). *Hollis* highlights additionally that consideration of the insured's interests is a paramount consideration. *See id.* at 391 n.2 ("[W]hat might be neglect in one instance could well constitute bad faith on the part of the insurer. The question is always: Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?" (citation and internal quotation marks omitted)).

## 2. *The Genesis of the First-Party Bad-Faith Claim*

Twenty-eight years after the *Waters* decision, the Supreme Court of Alabama brought into the fold the first-party bad-faith claim. *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 6 (Ala. 1981) ("The law will not allow an insurer to willfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need."). With respect to the "standard of proof an insured is required to meet in order to recover on a claim for bad faith" in the first-party context, the court held that "an actionable tort arises for an insurer's intentional refusal to settle a *direct claim* where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal." *Id.* at 7 (internal quotation marks omitted; emphasis added); *see also Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982) (explaining that based upon *Chavers*, "[a]n insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact" and that "[n]o lawful basis means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." (citation and internal quotation marks omitted)).

### 3.    *This Court's Findings as to the Proper Standard of Review*

On the basis of the Alabama Supreme Court's decisions in *Waters*, *Cosby*, and *Hollis*, the court finds untenable NGAC's position that an insurer is not liable on a third-party bad-faith claim where it has an arguable or debatable reason to deny a claim.  Neither *Waters* nor *Cosby* nor *Hollis* mentions an arguable-reason test[15] as an element of a plaintiff's third-party claim or suggests that an insurer can prevail if the insured cannot show the absence of an arguable reason for the insurer's refusal to accept a policy-limits settlement of the claim against the insured by a third party.  To the contrary, these decisions command a totality-of-circumstances approach.  *See, e.g.*, *Waters*, 73 So. 2d at 529 (holding that whether an insurance company acted in bad faith in the exercise of its settlement authority depends upon "all the facts and circumstances").

Additionally, in *Waters*, the court rejected an argument similar to the one that NGAC makes in this case.  In *Waters*, the insurer had argued that the insured should be "estopped" from asserting that the insurer "was guilty of bad faith or negligence in his decision to try the case . . . and not to settle" it because the insured consistently maintained in the underlying action that he had not been negligent.  *See* 73 So. 2d at 531.  The court disagreed, opining that "[t]hese facts

---

[15] The *Chavers* element requiring "no lawful basis for the refusal" is referred to by NGAC as the "arguable or debatable reason" test, which for brevity is referred to in this opinion as the "arguable-reason test."

were for the consideration of the jury *along with all the other facts and circumstances of the case.*"  *Id.* (emphasis added).  *Waters* indicates that an insurer's pre-suit refusal to settle a third-party's claim against its insured based upon the insured's headstrong denial of liability is a factor, but it is not the only factor relevant to the inquiry of whether the insurer engaged in bad faith in the evaluation of a third-party settlement offer.[16]  *Hollis* confirms *Waters*'s stance.  *See Hollis*, 554 So. 2d at 391 ("While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation [of settlement of a third-party claim] requires more.").

Furthermore, the *Chavers* court expressly held that its test applied to a "direct claim," 405 So. 2d at 7, and, in recognizing a new tort for first-party bad faith, it did not disown the third-party bad-faith claim.  Rather, it acknowledged the distinctions between first-party and third-party insurance claims.[17]  *See* 405 So. 2d

---

[16] Additionally, to the extent that NGAC relies on *State Farm v. Brechbill*, 144 So. 3d 248 (Ala. 2013), for the proposition that the arguable-reason test controls in a third-party bad-faith action, that reliance is misdirected.  *Brechbill* was a first-party bad-faith case that relied exclusively on the first-party bad-faith line of cases beginning with *Chavers*.

[17] The *Chavers* court explained that in the third-party scenario involving "liability insurance, the company owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claim, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in tort would be appropriate."  405 So. 3d at 5.  In the first-party context, however, the contract is "to pay a loss covered under the policy.  The insured is damaged by the failure to pay only in the sense that any creditor is damaged by the debtor's failure to pay a matured debt, but for this an action in tort will not lie since the remedy is on the contract.  Its liability under . . . the policy is to pay the amount of the loss in excess of the deductible amount . . . ."  *Id.* (citation and internal quotation marks omitted).

at 5.  The distinctions between the two types of claims support Alabama courts' different treatment of the claims.  Alabama courts do not stand alone.

As explained by the Arizona Supreme Court, which also holds first-party and third-party claims to different standards and restricts the arguable-reason test to the first-party bad-faith claim,

> an insurer owes its insured the same duty of good faith and fair dealing in both first- and third-party actions.  The standard for determining whether the insurer has breached its duty, however, is different in the two types of cases because of the different relationships and duties that exist between the parties.  In third-party actions, the insurer exclusively controls settlement and the insured bears a disproportionate share of the risk if the insurer fails to accept a reasonable settlement offer within policy limits.  The insured faces personal liability for an award exceeding policy limits, while the insurer's potential liability remains constant at policy limits.  Therefore, although the "fairly debatable" standard sufficiently protects both parties' interests in first-party actions, it inadequately protects the insured's interests in third-party actions.

*Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719, 723–24 (Ariz. 1990) (internal citation omitted).  In the third-party bad-faith context, "the debatability of the claim is not determinative; the insurer must also weigh other considerations, such as the financial risk to the insured in the event of a judgment in excess of the policy limits."  *Id.* at 723.

### 4.    *The Outlier Decision*:  Mutual Assurance, Inc. v. Schulte, 970 So. 2d 292 (Ala. 2007)

NGAC contends that *Mutual Assurance, Inc. v. Schulte*, 970 So. 2d 292 (Ala. 2007), is clear authority for its position that the arguable-reason test is an

element of a plaintiff's claim in a third-party bad-faith case.  In *Schulte*, the Alabama Supreme Court affirmed the trial court's order denying summary judgment to the insured on a third-party negligent-failure-to-settle claim.  It "express[ed] no opinion," however, "as to that part of the trial court's order denying [the insurer's] summary-judgment motion as to the bad-faith-failure-to-settle claim because [its] decision on the negligent-failure-to-settle claim and the unique procedural posture of this case render[ed] a review of that claim unnecessary."  *Id.* at 294.  Nonetheless, the Alabama Supreme Court later remarked in the same opinion that "the inquiry relevant to a claim alleging bad-faith failure to settle is whether the insurer's failure to settle had any lawful basis, that is, whether the insurer had any legitimate or arguable reason for failing to pay the claim."  *Id.* at 296 (citations and internal quotation marks omitted).  NGAC's position that *Schulte* correctly recites Alabama's standard for analyzing a *third-party* bad-faith claim is shaky for at least two reasons.

First, the Supreme Court of Alabama deemed it unnecessary to address the third-party bad-faith claim based upon an agreement between the parties that rendered the claim moot.  The lone sentence upon which NGAC then relies is not part of the court's holding.  Rather, it is "mere obiter dictum," and not binding authority.  *Ex parte RCHP-Florence, LLC*, ___ So. 3d ___, 2013 WL 4873468, at *8 (Ala. Civ. App. 2013) (citing *Wilkinson v. Rowe*, 98 So. 2d 435, 440 (Ala.

1957) ("If we were to express an opinion based on facts not shown by the record in this case, that opinion would be dicta and would not be binding in subsequent cases.")).   One of the concurring justices in *Schulte* also recognized the narrow holding of the main opinion, sweeping the rest of it into the bin of dicta.  *See* 970 So. 2d at 298 (Because the "only question before this Court . . . is the very narrow question whether the existence of a validly enacted statute automatically precludes *in every case* any further inquiry into whether an insurer has acted reasonably in presuming the constitutionality of that statute and relying thereon in its decision not to settle a claim against its insured" and "because upon our decision of this question other issues will become moot in light of the parties' agreement . . . , the discussion of other issues is dicta.") (Murdock, J., concurring in result).

Second, although dictum can be persuasive and telling as to how a state court would hold, this court is not convinced that the Alabama Supreme Court would find *Schulte*'s dictum convincing.  The dictum is unaccompanied by any analysis.  And, although it leans upon a string cite of two decisions for support, those two decisions were analyzing *first-party* bad-faith claims, not *third-party* bad-faith claims.  Adoption of the standard NGAC draws from the *Schulte* dictum would require the Alabama Supreme Court to turn a blind eye to more than fifty years of precedent, where not once has the court incorporated the arguable-reason test as an element of a third-party bad-faith claim.   Because the dictum in *Schulte*

upon which NGAC relies contradicts *Waters*' totality-of-circumstances approach, it is deemed a non-binding, stray remark.

**5.    *Summary of the Proper Standard for Reviewing a Third-Party Bad-Faith Claim Under Alabama Law***

Alabama law does not incorporate the arguable-reason test as an element of a plaintiff's claim in a third-party bad-faith case.  Rather, whether an insurance company acted in bad faith in the exercise of its settlement authority depends upon "all the facts and circumstances."  *Waters*, 73 So. 2d at 529.  The facts and circumstances that are relevant to whether an insurer acted in bad faith in evaluating settlement of a third-party claim – culled from *Waters*, *Cosby*, and *Hollis* – include, but are not limited to, the following:[18]  (1) whether the insurer adequately investigated the facts of this case; (2) whether the insurer conducted a dishonest evaluation of the case; (3) how the insurer viewed its insured's liability; (4) whether the insurer considered the welfare of the insured; (5) whether there was an opportunity to settle the case within policy limits; (6) whether the insurer evaluated the anticipated range of a verdict, should it be adverse;  (7) whether the

---

[18] Because there is ample authority from the courts of Alabama, it is unnecessary to address Ms. Franklin's arguments advocating the application of the factors set out in *Carrier Express, Inc. v. Home Indemnity Co.*, 860 F. Supp. 1465 (N.D. Ala. 1994), for evaluating a claim that an insurer breached its enhanced duty of good faith in its defense under a reservation of rights, when it failed, among other things, to settle within the policy limits when it was possible to do so.  *Id.* at 1479–80.  At the same time, it also is unnecessary to delve into NGAC's arguments that *Carrier Express*'s factors are inapplicable because NGAC did not defend Ms. Franklin under a reservation of rights and because under Alabama law the claim at issue in *Carrier Express* sounds in contract, not tort.

insurer examined the financial risk to the insured in the event of an excess judgment in excess of the policy limits;  (8) whether the insurer considered the strengths and weaknesses of all of the evidence from a liability and damages standpoint; (9) whether the insurer considered the history of the particular geographic area in cases of similar nature; and (10) whether the insurer considered the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

## B.    <u>Application of the Standard</u>

As pointed out by NGAC, this case is made up of a "small mountain of facts."  Not every rock of that mountain needs to be unearthed for purposes of showing why Ms. Franklin has presented sufficient facts to create a genuine dispute of material fact on the question of bad faith.  The facts discussed below, thus, are not all of the facts, but are facts sufficient to deny summary judgment.

### 1.    *Whether NGAC Adequately Investigated the Facts*

Mr. Sneed, handling his first bodily injury claim, denied Mr. Gutierrez's bodily injury claim five days after he had opened the file and a mere one day after his letter informing Mr. Gutierrez's counsel that he was in the midst of an investigation of the accident.  He denied the claim, notwithstanding that the day before he had requested medical records and a settlement demand from Mr. Gutierrez's lawyer and even though those requests still were pending.  Mr.

Gutierrez independently decided that a denial was appropriate based solely upon his consideration of the police report, Ms. Franklin's oral telephonic statement that Mr. Gutierrez was at fault, and an appraisal estimate of the damage to Mr. Gutierrez's vehicle, which included photos of that vehicle.  And his assessment of Mr. Gutierrez's claim focused only on the potential liability of the insured.

Mr. Sneed admitted that he "was supposed to talk to all witnesses and interested parties." (Sneed's Dep., at 206–13.)  Yet, Mr. Sneed did not speak with the investigating officer.  He did not ask follow-up questions of Ms. Franklin (such as whether there were skid marks, whether she applied her brakes, whether she was on her cell phone, the relative speeds of the vehicles, or her line of sight).   He "made the conscious decision to not talk to Mr. Gutierrez" or "get his side of the story," even though the police report did not contain a statement from him.  Mr. Sneed did not inquire about the extent of Mr. Gutierrez's injuries.  He did not talk to any potential witnesses, such as employees at the gas station or the ambulance driver.  He did no scene investigation, other than to look at the diagram on the police report.  (Sneed's Dep., at 57–59, 70, 146–151, 160–67, 194–95, 203–04, 220, 321–22.)  Based upon this evidence, a reasonable jury could conclude that Mr. Sneed's investigation was inadequate to ascertain the facts of the accident.

### 2.   *Whether NGAC Conducted an Honest Evaluation and Its View on Liability*

Mr. Sneed conveyed to Mr. Gutierrez's counsel a single reason for denying the claim:   Ms. Franklin "was not legally liable for [Mr. Gutierrez's] loss." (Sneed's Feb. 23 Letter (Ex. D to Compl.).)   That February 23, 2010 denial was based solely upon a liability assessment that Mr. Gutierrez was contributorily negligent.   In Mr. Sneed's view, a finding that Mr. Gutierrez was even one-percent contributorily negligent would completely bar Mr. Gutierrez from recovering from Ms. Franklin under Alabama law and was reason enough to deny Mr. Gutierrez's claim and settlement demands.   (Sneed's Dep., at 176, 184, 197; Claims Note, at 12340.)   A reasonable jury could conclude that Mr. Sneed's evaluation of the case – that took into consideration limited facts, did not examine the possibility of settlement, and focused solely on the insurer's perception of the insured's liability – was not honest or objective.

Moreover, pre-suit, every NGAC employee who reviewed Mr. Gutierrez's claim continued to stand on the denial of Mr. Gutierrez's claim based only on the liability assessment and the earlier cursory investigation.   (*See* Claims Note, at 12340 (Schultz's Mar. 9, 2010 Note (noting that "1% [contributory negligence] bars recovery" and that "we have at least that against [Mr. Gutierrez]" and that, therefore, she was taking the file "[o]ff manager diary"); Lord's June 2, 2010 LLR, at 10515 ("We have previously denied liability twice on this case. . . .  I still

feel culpability on the part of the claimant of at least 1% which is grounds for our original liability denial in Alabama.").[19]   Pre-suit, NGAC never wavered in its decision that its assessment of fault warranted a denial of the claim – not when Mr. Sneed learned on February 23, 2010 (the day after he denied the claim) that the accident had rendered Mr. Gutierrez a paraplegic and that there were no skid marks at the scene, not when the claim was reassigned in April 2010, to a "high exposure" claims handler (Mr. Lord), and not when Mr. Gutierrez offered (three times) to settle the claim for the $50,000 Policy limits.

While clearly the view of the insurer was that its insured was not liable to Mr. Gutierrez under Alabama law, even a "sincere belief" does not equate "good faith."  *Hollis*, 554 So. 2d at 390.   Additionally, Ms. Franklin has presented sufficient evidence from which a reasonable jury could call into question the sincerity of that belief and that evidence ties back into NGAC's inadequate investigation of the facts.   For example, there is evidence that NGAC's investigation of the other side of the pancake[20] was lacking.  Mr. Gutierrez's side of the story rendered Ms. Franklin clearly liable for the accident.  He contended that he had not turned right out of the gas station, but had been traveling at least a

---

[19] NGAC's decision to deny Mr. Gutierrez's claim and refuse to settle for the Policy limits pre-suit was authorized by six different employees at four different levels within NGAC. All six "agreed with a denial of the claim on the basis of contributory negligence."  (Def.'s Answers to Interrogs. (Pl.'s Ex. 40-4).)

[20] A pancake, no matter how thin, has two sides.

quarter mile on Highway 231 at a lawful speed when he was rear-ended by Ms. Franklin, who was texting and speeding at the time of impact.   Additionally, NGAC learned on February 23, 2010, through Mr. Bennett's telephone call to Mr. Sneed that there was a clear dispute as to liability.   Accordingly, a reasonable jury could conclude that NGAC opted to forego any independent investigation of Mr. Gutierrez's version and to rely on Ms. Franklin's statement and the police report, which did not encompass a statement from Mr. Gutierrez. (*See* Lord's Dep., at 143–44 (admitting that it is not "sound claims practice to deny claims when you only get one side of the story" and that "[o]bviously, you want to have all sides." ).)   Moreover, a reasonable jury could find that during the entirety of the nearly four months preceding suit, NGAC's evaluation of the case was not an honest one.

### 3.   *Whether NGAC Considered the Welfare of Ms. Franklin*

While NGAC had the contractual authority to settle Mr. Gutierrez's claim within the Policy limits as it "considere[d] appropriate" (*i.e.*, without Ms. Franklin's authority), given that Ms. Franklin bore the greater financial risk of litigation and possible exposure to an excess judgment, the court finds that what transpired in the communication lines between NGAC and Ms. Franklin is relevant to whether NGAC considered the welfare of Ms. Franklin in its decision not to settle the case.

The summary judgment evidence reveals that there were no communication lines. Ms. Franklin has testified that no one from NGAC ever told her before suit was filed (1) that Mr. Gutierrez was rendered a paraplegic from the collision, (2) that Mr. Gutierrez had made several time-limited offers to settle for the $50,000 Policy limits and to give Ms. Franklin a full and final release from further liability, (3) that, if the time-limited demands were not accepted that he would never settle and would move forward to trial, or (4) that if the jury believed Mr. Gutierrez, Ms. Franklin would be exposed to a multi-million dollar judgment. (Laura Franklin's Aff. (Pl.'s Ex. 140-41); *see also* Dale Franklin's Aff. (Pl.'s Ex. 140-42).) In sum, a reasonable jury could conclude that NGAC, when determining whether to settle the claim, did not give at least as much consideration to the welfare of its insured that it gave to its own interests. *See Hollis* 554 So. 2d at 391 ("The insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own.").

### 4. *Whether NGAC Had an Opportunity to Settle the Case Within Policy Limits*

It is undisputed that, pre-suit, Mr. Gutierrez made three written offers to settle his claim against Ms. Franklin for the $50,000 Policy limits and that NGAC accepted none of those offers. Mr. Gutierrez made an open-ended offer on April 7, 2010, and time-restricted offers on April 21, 2010, and on May 27, 2010. Each time, NGAC ignored the offer, letting its silence stand as its rejection. NGAC

alludes to Mr. Gutierrez's time-limited demands as "high pressure settlement tactics" (LLR, at 10515), but a reasonable jury also could conclude that NGAC's failure to acknowledge the first offer warranted a time-limited demand on future offers. A reasonable jury also could conclude that Mr. Sneed's denial of the claim on February 23, 2010, without waiting for the settlement demand that he had requested only the day prior is evidence that NGAC's request was superficial and that it was unwilling to entertain settlement. Based upon this evidence, a reasonable jury could conclude that NGAC had multiple pre-suit chances to settle the case, but refused to respond to those offers or make any attempt to settle the claim for the Policy limits prior to litigation.

### 5. Whether NGAC Evaluated the Anticipated Range of a Verdict, Should It Be Adverse, and the Financial Risk to Ms. Franklin if the Case Did Not Settle for Policy Limits

There is scant evidence that, pre-suit, Mr. Sneed or any other NGAC employee weighed the relative risk of exposure to Ms. Franklin against the relative risk of NGAC's exposure should the case proceed to trial without a settlement for the $50,000 Policy limits. Mr. Sneed admits that he did not weigh the relative risks and testified that NGAC did not train or instruct him to make a comparison of the insurer's and insured's relative risks. (Sneed's Dep., at 345.) Ms. Gregg, the highest-level supervisor in the echelon of supervisors who reviewed the file, admitted that she "did not receive any written risk analysis in the file during that

time period." (Ms. Gregg's Dep., at 278–79, 307–08.) While there is evidence that, on April 19, 2010, Mr. Lord confirmed that he knew Ms. Franklin's "exposure was going to be much greater than the amount of coverage she had" (Lord's Dep., at 155), there is no indication that Mr. Lord factored in that exposure when recommending against a settlement for Policy limits. Rather, it was not until the end of September 2010 – after NGAC had rejected three offers to settle for Policy limits and more than three months after suit had been filed – that NGAC put a number on Ms. Franklin's financial risk if she lost at trial – $5 million or more – and deemed a settlement for Policy limits an economically sound decision to avoid a potentially large excessive judgment. (*See* LLR, at 10519; Gregg's Dep., at 304–08 (confirming that a risk analysis until more than three months after suit was filed).) By comparison, the facial litigation risk to NGAC was miniscule: $50,000 at most.

Based upon this evidence, a reasonable jury could conclude that the anticipated range of an adverse verdict was in the seven-figure range, that the litigation's financial risk to the insurer was inordinate, and that NGAC failed to consider Ms. Franklin's exposure when rejecting Mr. Gutierrez's pre-suit demands to settle the case within the $50,000 Policy limits. Whether NGAC's eventual post-suit change-of-heart to agree to settle within Policy limits was the product of a

timely and honest evaluation, and fair dealing with its insured, is for the jury to decide.

**6.    *Whether NGAC Considered the Strengths and Weaknesses of All of the Evidence from a Liability and Damages Standpoint, the History of the Particular Geographic Area in Cases of Similar Nature, and the Relative Appearance, Persuasiveness, and the Likely Appeal of the Claimant, the Insured, and the Witnesses at Trial***

There is no question that Mr. Gutierrez and Ms. Franklin hotly contested liability.  But even if "the question of liability [is] close," that is not the be-all and end-all of the facts-and-circumstances inquiry, particularly where "the severity of injury [is] great."  *Hollis*, 554 So. 2d at 391 (citation and internal quotation marks omitted).  A reasonable jury could conclude that the fact that liability was in dispute should have prompted NGAC to make further investigative inquiries of Mr. Gutierrez's version of events, and not foreclose pre-suit settlement altogether. It could decide that NGAC, while touting the perceived strengths of its case (essentially its belief that Mr. Gutierrez was at least one-percent contributorily negligent), failed to conduct an adequate investigation or give due consideration to the case's potential weaknesses (*i.e.*, Mr. Gutierrez's side of the story, which found corroboration in the circumstantial evidence had NGAC looked).  The same could be said with respect to NGAC's assessment of damages, which post-suit NGAC admitted were great.  NGAC knew as early as February 23, 2010, that, as a result of the collision, Mr. Gutierrez had been transported by ambulance and was

paralyzed from the waist down.  By May 14, 2010, it also knew that Mr. Gutierrez had undergone two surgeries, had at least $58,000 in medical bills for his initial six days of hospitalization, and had a lower spinal injury.

Although NGAC contends that Mr. Gutierrez should have provided complete medical records, thus, appearing to blame him for its belated knowledge of his dire condition, there is ample evidence from which a reasonable jury could conclude that NGAC did not do its part.  Mr. Lord testified that he was required to "gather, analyze and evaluate, for settlement purposes, all supportive medical documentation."  Yet, when Mr. Bennett protested the expense to his client to obtain medical records, Mr. Lord did not request authorization from Mr. Bennett to obtain the medical records, even though NGAC's files included a form letter for obtaining medical-records authorization, a form Mr. Bennett would have permitted Mr. Gutierrez to sign had NGAC made the request.  (Mr. Lord's Dep., at 63–65; *see also* NGAC Form Letter with Form Medical Authorization (Pl.'s Ex. 140-45); Bennett's Aff. ¶ 6 (Pl.'s Ex. 140-40).)

Based upon the summary-judgment evidence, a reasonable jury could conclude that NGAC, in evaluating the potential for settlement, failed to consider the strengths and weaknesses of all of the evidence from a liability and damages standpoint.  NGAC also points to no evidence that in evaluating settlement, it considered the history of the particular geographic area in cases of similar nature,

or the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the potential trial witnesses.  From aught that appears, a reasonable jury could conclude that NGAC evaluated the pre-suit settlement offers based solely upon a liability assessment and that the post-suit offer of settlement – seeking to mitigate NGAC's exposure to an excess judgment – came too late.

### 7.    *Whether the Facts and Circumstances Raise a Genuine Dispute of Material Fact*

Based upon all the facts and circumstances, Ms. Franklin has raised a genuine dispute of material fact as to whether, when presented with three pre-suit offers to settle the claim for the Policy limits, NGAC's refusal to settle was the proximate result of bad faith.  It will be for the jury to decide whether NGAC intentionally failed to use ordinary care to conduct an investigation of the facts and whether it intentionally failed to act honestly and in good faith toward Ms. Franklin.

## V. CONCLUSION

Whether NGAC acted in bad faith in refusing Mr. Gutierrez's offers to settle his claim against its insured, Ms. Franklin, for the $50,000 Policy limits requires consideration of "all the facts and circumstances."  *Waters*, 73 So. 2d at 529.  The facts and circumstances present a genuine dispute of material fact; therefore, NGAC's summary judgment motion on the third-party bad-faith claim is due to be denied.  Additionally, the motion for summary judgment on the claims for third-

party wanton failure to investigate and settle and for breach of contract (Counts I and III) are due to be denied because the court finds that the summary judgment motion raises state law issues, at least one of which is novel, which would be better addressed after a trial on the merits.

Accordingly, it is ORDERED that NGAC's motion for partial summary judgment (Doc. # 128) is DENIED.

DONE this 23rd day of January, 2015.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE